UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WISCONSIN

CARLON COMPANY,
Plaintiff,
v.

DELAGET, LLC,
Defendant,

ACUITY, A Mutual Insurance Company,

Intervenor Defendant,
and

DELAGET, LLC,
Third-Party Plaintiff,
v.

PHILADELPHIA INDEMNITY INSURANCE COMPANY, and MORGAN STANLEY SMITH BARNEY, LLC,

Third-Party Defendants.

Case No. 11-CV-477-JPS

ORDER

On November 22, 2011, intervenor defendant Acuity, A Mutual Insurance Company ("Acuity") filed a Motion for Summary Judgment (Docket #53). On December 30, 2011, defendant and third-party plaintiff Delaget, LLC ("Delaget") filed a Motion to Strike (Docket #73), requesting the court strike Acuity's motion. Because the court can decide the motion for summary judgment despite Acuity's failure to properly file a statement of proposed facts, the court will deny the motion to strike and dispose of the

motion for summary judgment.[1] Acuity's motion requests judgment that it has no duty to defend or indemnify Delaget. The court will grant that motion.

In August 2008, plaintiff Carlon Company ("Carlon") opened an account with Morgan Stanley Smith Barney, LLC ("MSSB"). Carlon engaged Delaget to perform certain cash management services on Carlon's behalf. As such, Carlon authorized MSSB to provide Delaget with a user name and password to access Carlon's accounts for the purpose of transferring funds. Carlon later discovered a sum of money had been removed from its account without authorization. Carlon initiated this suit against Delaget, alleging that Delaget negligently failed to exercise ordinary care in safeguarding and protecting the user name and password for Carlon's MSSB account. Acuity insured Delaget under both a Bis-Pak Business Liability Coverage Form and Bis-Pak Property Coverage Form. Delaget tendered the defense against Carlon's claims to Acuity and Acuity, having intervened, has now moved for summary judgment, asserting that there is no coverage under either form.

1. FACTS

Delaget is a limited liability company organized in Delaware with its principle place of business in Minnesota. (Intervenor's Resp. to Def.'s Proposed Findings of Fact [hereinafter RDPFF] ¶ 1) (Docket #67). While its

---

[1]While Delaget did not have a normal opportunity to respond to Acuity's eventually-filed proposed findings of fact, the parties' submissions do not offer facts upon which there appear to be disagreement. Moreover, the only issues in dispute here are interpretations of the policy language as applied to the facts alleged in the complaint. The complaint is before the court, and both parties have submitted full copies of the policy language, thus, there are no factual disputes in any event. Granting the motion to strike would needlessly prolong resolution of the legal issues.

principle place of business is Minnesota, Delaget also operates in Wisconsin, as evidenced by Carlon's engagement of Delaget's services through Delaget's Madison, Wisconsin, office. (Compl. Count I ¶ 4) (Docket #1); (Def.'s Ans. Count I ¶ 4) (Docket #22). Acuity is organized under the laws of Wisconsin, which is also its principle place of business. (RDPFF ¶ 3). Delaget accepted the policy at issue in Golden Valley, Minnesota. (RDPFF ¶ 5). Though not laid out in either party's proposed findings of fact, they agree in their briefing that the policy was negotiated in each of Minnesota, Missouri, and Wisconsin. They also agree that the contract was performed in both Minnesota and Wisconsin.

The policy at issue contains two parts: Commercial Excess Liability Coverage and Bis-Pak Coverage. (RDPFF ¶ 7). The Commercial Excess Liability Coverage is not at issue. The Bis-Pak Coverage, in turn, contains two coverage forms: the Bis-Pak Business Liability and Medical Expenses Coverage Form ("Liability Coverage Form"), and the Deluxe Bis-Pak Property Coverage Form ("Property Coverage Form"). (RDPFF ¶ 8).

1.1 Liability Coverage Form

Under the Liability Coverage Form, Acuity contracted to "pay those sums that the insured becomes legally obligated to pay as damages because of…property damage…to which this insurance applies." (RDPFF ¶ 9); (Grimley Aff. Ex. 1, Bis-Pak Business Liability & Med. Expenses Coverage Form [hereinafter Liability Form], at 1) (Docket #59-1). "Property damage" is defined as "[p]hysical injury to tangible property" or "[l]oss of use of tangible property that is not physically injured." (RDPFF ¶ 11). Regarding loss of use, "[f]or purposes of this insurance, electronic data is not tangible property." (RDPFF ¶ 11). The form elaborates that, "electronic data means

information, facts or programs stored as, created or used on, or transmitted to or from computer software." (RDPFF ¶ 11). The Liability Coverage Form also contains an exclusion for "Professional Services," wherein property damage "due to rendering or failure to render any professional service," including but not limited to accounting services, is not covered. (RDPFF ¶ 15).

1.2 Property Coverage Form

Under the Property Coverage Form, Acuity contracted to pay for "direct physical loss of or damage to Covered Property at the premises described…caused by or resulting from any Covered Cause of Loss." (RDPFF ¶ 16). The form contains an extension covering "Money and Securities" that obligates Acuity to

> pay for loss of money and securities used in your business while at a bank or savings institution, within your living quarters or the living quarters of your partners or any employee having use and custody of the property, at the described premises or in transit between any of these places, resulting directly from…[t]heft.

(RDPFF ¶ 18). The Money and Securities extension contains an exclusion for loss "[r]esulting from accounting or arithmetical errors or omissions." (RDPFF ¶ 18). The form defines "money" as "[c]urrency, coins and bank notes in current use and having a face value" or "[t]ravelers checks, register checks and money orders held for sale to the public." (RDPFF ¶ 19). "Securities" are defined as "negotiable and nonnegotiable instruments or contracts representing either money or other property," including "[t]okens, tickets, revenue and other stamps…in current use" or "[e]vidences of debt

issued in connection with credit or charge cards," but does not include money. (RDPFF ¶ 19).

      1.3      Allegations in the Complaint and Theft of Funds

Carlon, a company owning and managing multiple restaurants, originally engaged Delaget to perform accounting, bookkeeping, payroll, and other cash management services. (RDPFF ¶¶ 20-21). In connection with those services, Carlon authorized Delaget to access various accounts for the purpose of transferring funds between them. (RDPFF ¶ 22). The transfers were part of the services provided by Delaget. (RDPFF ¶ 23). One of these accounts was maintained with MSSB and Delaget was provided a user name and password for the account. (RDPFF ¶¶ 24-25). On May 6, 2011, Carlon discovered that roughly $696,656.00 had been removed from its MSSB account without authorization. (RDPFF ¶ 26). For purposes of this motion, Acuity and Delaget agree that a Delaget computer may have been infected with a virus that allowed a third party to control the computer, direct transfers out of the Carlon account, and change the account password. (RDPFF ¶¶ 27, 29). Acuity and Delaget also agree, for purposes of the motion, that there is no basis to believe a Delaget employee was involved in changing the password or the unauthorized transfers. (RDPFF ¶ 30). As a result, Carlon's complaint asserts that Delaget breached its duty of ordinary care in safeguarding and protecting the user name and password for the MSSB account. (RDPFF ¶¶ 37-38).

2.     DISCUSSION

Because the court finds no coverage under either coverage form appealed to, the court will grant Acuity's motion. At issue first is the choice of law used to interpret the insurance policy; whether the appropriate law is

Wisconsin or Minnesota state law. As to the substance of the motion, Acuity asserts a lack of coverage because Carlon's lost funds neither constitute tangible property, nor are they money used in Delaget's business. "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986); *McNeal v. Macht*, 763 F. Supp. 1458, 1460-61 (E.D. Wis. 1991). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." *See Anderson*, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* In other words, in determining whether a genuine issue of material fact exists, the court must construe all reasonable inferences in favor of the non-movant. *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. Voigt*, 700 F.2d 341, 349 (7th Cir. 1983).

    2.1    Choice of Law

After consideration, the court finds that Wisconsin law governs the insurance contracts at issue. A federal court sitting in diversity applies the choice-of-law rules of the forum state. *In re Jafari*, 569 F.3d 644, 648 (7th Cir. 2009). As such, the court applies Wisconsin choice-of-law rules in determining whether Wisconsin law applies, or whether Minnesota law applies, as Delaget contends.

In resolving contractual disputes, Wisconsin courts apply a "grouping of contacts" rule, requiring application of the law from the jurisdiction "with which the contract has its most significant relationship." *State Farm Mut. Ins.*

*Co. v. Gillette,* 2002 WI 31, ¶26, 251 Wis.2d 561, 641 N.W.2d 662. The law of the forum is presumed to apply unless clear that the non-forum contacts are of "greater significance." *Drinkwater v. Am. Family Mut. Ins. Co.,* 2006 WI 56, ¶ 40, 290 Wis.2d 642, 714 N.W.2d 568. However, where the laws of the two states are the same, Wisconsin courts apply Wisconsin law. *Deminsky v. Arlington Plastics Mach.*, 2003 WI 15, ¶ 20, 259 Wis. 2d 587, 657 N.W.2d 411.

Though the court is not convinced that Minnesota law clearly has the most significant relationship with the contract, the court finds that the two states would apply the same rules and will, therefore, apply Wisconsin law. There is only one arguable dispute regarding what rule would be applied in Minnesota as opposed to Wisconsin. Delaget cites two Minnesota cases for the supposed proposition that if potential as-yet-discovered facts might place the case within the duty to defend, an insurance company may not be granted summary judgment on the issue of coverage. That proposition is not a proper reading of those cases, however. To begin, Minnesota courts, like Wisconsin courts, "compare the allegations in the *complaint* in the underlying action with the relevant language in the *insurance policy*" to determine whether the duty to defend exists. *Meadowbrook, Inc. v. Tower Ins. Co.*, 559 N.W.2d 411, 415 (Minn. 1997) (emphasis in original); *cf. Fireman's Fund Ins. Co. of Wis. v. Bradley Corp.*, 2003 WI 33, ¶ 19, 261 Wis. 2d 4, 660 N.W.2d 666 (same proposition). The Minnesota Supreme Court has written that "[w]hether an insurer is under an obligation to defend is not always free from doubt until the case is actually tried." *Crum v. Anchor Cas. Co.*, 119 N.W.2d 703, 711 (Minn. 1963). The *Crum* court went on to state that if an insurer gains knowledge of any facts outside the complaint creating the

potential for coverage, the insurer has a duty to defend. *Id.* at 712. The insurer's duty to defend extends until a determination as a matter of law that there is no obligation to indemnify the insured. *Meadowbrook*, 559 N.W.2d at 416. However, none of these statements disturb the rule of first-instance that the duty to defend is determined on the basis of the complaint, and none of these statements intimate that a court must refrain from granting summary judgment because an insurer *might* come into the knowledge of facts potentially putting the case within the scope of coverage. In fact, as the *Meadowbrook* court elaborated, "[i]n [*Crum*] we held that the insurer could not withdraw after assuming the insured's defense, but only because the insurer *was aware of facts* that arguably placed part of the underlying claim within the policy's coverage." *Id.* at 415 (emphasis added). Delaget has alleged no facts outside the complaint that Acuity supposedly holds which would invoke the duty to defend, and there is no reason to believe that Minnesota law calls for withholding summary judgment in what would amount to all cases because of the possible future discovery of such facts. As such, even to the extent that Minnesota's willingness to look outside the complaint might differ from Wisconsin law, that situation is not even implicated here. Instead, based on the current posture, Wisconsin and Minnesota law are in accord on this issue. Because there is no other demonstrated difference between the two states' laws, the court will apply the law of the forum state: Wisconsin.

2.2    Policy Coverage

Next, the court concludes that there is no coverage under the insurance policy at issue and Acuity, therefore, has no duty to defend or indemnify Delaget. In determining policy coverage, a court first looks to the

factual allegations to determine whether there is an initial grant of coverage, then looks to any exclusions that may preclude coverage, and finally looks to any exceptions to applicable exclusions. *Am. Family Mut. Ins. Co. v. Am. Girl, Inc.*, 2004 WI 2, ¶ 24, 268 Wis. 2d 16, 673 N.W.2d 65. Exclusions are narrowly construed against the insurer where the effect is uncertain. *Id.* Undefined terms are interpreted as they would be understood by a reasonable insured and in accord with its plain meaning where it is unambiguous. *Acuity v. Bagadia*, 2008 WI 62, ¶ 13, 310 Wis. 2d 197, 750 N.W.2d 817. But where policy language is "susceptible to more than one reasonable construction when read in context," the policy is to be interpreted in favor of the insured. *Id.* Despite this preference, however, "policies should be given a reasonable interpretation and not one that leads to absurd results…and construction should not bind an insurer to a risk it did not contemplate." *Thompson v. Threshermen's Mut. Ins. Co.*, 493 N.W.2d 734, 737 (Wis. Ct. App. 1992). At issue here is the existence of coverage under either the Liability Coverage Form or the Property Coverage Form. Delaget argues that coverage exists under the Liability Coverage Form for property damage, specifically, the loss of use of tangible property. Delaget also argues that there is coverage under the Property Coverage Form for the loss of money and securities. The court discusses each form in turn, disagreeing with both contentions.

2.2.1 Loss of Use of Tangible Property

Acuity first argues that the electronic bank account funds in question here do not constitute "tangible property." Because the Liability Coverage Form defines property damage as physical injury to or loss of use of tangible

property, if the funds in Carlon's account are not tangible property, there is no coverage. The court concludes the funds are not "tangible property."

According to Black's Law Dictionary, tangible means "[h]aving or possessing physical form." Black's Law Dictionary, tangible (9th ed. 2009). Delaget argues that this term is reasonably susceptible to more than one meaning and, thus, should be read to include electronic funds residing in a bank account. It first cites to a U.S. Supreme Court case wherein it held that money is property. *Pirie v. Chi. Title & Trust Co.*, 182 U.S. 438, 443-44 (1901). In the context of a bankruptcy statute, the Court noted that money is property, regardless of its form, whether it is composed of precious metal or not. *Id.* Delaget takes this to mean that the Court concluded "it is simply incongruous to define money based on its particular form." As such, Delaget argues there is no principled distinction between electronic funds and other forms of money and thus money which may be transferred electronically is tangible property. However, Delaget takes a logical leap where the Court did not follow. Money is indeed property, and various forms of money (electronic funds, hard currency, etc.) remain money, thereby remaining property. But that statement says nothing about whether a given type of property is tangible or intangible, nor does it follow that all forms of money are *always* either one or the other, regardless of form (let alone that they are always tangible in particular). Though all forms of money may always be property, it would not follow that all forms of money are always *tangible* property. While it may be incongruous to define money based on its form, it is not incongruous to distinguish between the forms of money. Analogously, it is unquestionable that an oral contract and a written contract

are both contracts—both promises—but clearly the former is intangible while the latter is tangible. Form of presentation is a separate quality from the physical materiality of that form.[2]

Delaget also cites to a case from the District of Nevada holding that conversion of bank account funds constituted loss of use of tangible property. *Capitol Indem. Corp. v. Wright*, 341 F. Supp. 2d 1152 (D. Nev. 2004). In that case, the court concluded that the definition of "tangible property" was satisfied where the thief had the victim sign for, and withdraw hard currency which he then converted. *Id.* at 1159. Delaget argues in a footnote that the *Capitol Indemnity* court did not distinguish between currency and non-currency for purposes of coverage, but the text of the decision belies that assertion. The court specifically wrote,

> in *Johnson* there was no transference of currency in its physical form. In the instant case, it appears that the money was in fact converted in its physical form. That is, the victim Mr. Forte was taken to a bank by Richard Smith and the victim signed for the money, i.e., hard currency. The money was then converted by Smith. Thus, it appears that the definition of tangible property is satisfied here.

*Id.* That is a very clear distinction. The court may not have expressed an opinion regarding whether non-currency would satisfy the definition of "tangible property," but it certainly rested its decision on the conversion of

---

[2]To wax philosophical, the comparison can also be made to the essence of an object versus its accident; essential properties versus accidental ones. The necessary characteristics of an object provide its identity, but that object may have contingent characteristics which may or may not be present, but do not alter its identity. With this in mind, the tangible or intangible quality of money is not necessary to its identity; its physical materiality does not affect whether it is accepted as money. As such, there may exist both tangible and intangible forms of money.

tangible currency. Delaget argues that such a distinction is illogical and nonsensical because it would require different results where a thief withdraws hard currency from an account, then deposits it into his own account, as opposed to where the thief merely electronically transfers the funds. Though the results are different, the difference is perfectly sensible in light of the policy language. The language specifically excludes electronic data from coverage under property destruction. Thus, if a hacker were to steal a copy of a document stored on a Delaget computer, deleting the original in the process, there would be no coverage; yet, were a thief to access that same computer, delete the file, and then abscond with a hard copy sitting next to the computer, the exclusion would not apply. The result is nonsensical only insofar as it is nonsensical to agree to a policy that contains an exclusion for electronic data. The data contained in a word processing file is just as readily converted to physical form as are the electronic funds in a bank account.

These arguments also ignore the full context of the property destruction provision. The loss-of-use clause refers to tangible property that is *not otherwise physically injured.* Because the provision covers either physical injury, or loss of use where physical injury has not occurred, the implication is that the property must be susceptible to physical injury. Electronic funds in a bank account are clearly not susceptible to physical injury. Thus, Delaget's ultimate argument can only be that, despite the reality that electronic funds in a bank account are *de facto* intangible, they should nevertheless be considered the equivalent of a tangible object due to considerations of modernization in financial systems. The argument proceeds that because an intangible object can be converted into an

equivalent tangible object, the court ought to treat the intangible object as tangible. That stretches too far, removing virtually all meaning from the term "tangible," explicitly used in the policy. Moreover, lest this be seen as an obstinately narrow view given the realities of modern financial transactions, the court need only point to the fact that the Property Coverage Form specifically provides coverage for lost money. It is reasonable to presume that, where an insured has procured a policy that provides coverage for loss to both tangible property as well as loss of money, that the insured would understand that electronic money is covered where the policy says "money" and not under a separate provision.[3] At the end of the day, it is clear that electronic funds are not tangible by the ordinary meaning of that word, and no precedent or sufficient justification has been provided for treating them as such. Because the electronic funds stolen from the MSSB account are not tangible property, there is no coverage under the Liability Coverage Form.[4]

2.2.2 Loss of Money and Securities

As to the Property Coverage Form, Acuity argues that Carlon's funds were not used in Delaget's business.[5] The provision in question covers losses to money used in *Delaget's* business while located at a bank, within Delaget's

---

[3]This might be a different case if there were no coverage for "money," only tangible property, but that case is not before the court.

[4]As such, the court need not analyze whether the professional services exclusion applies.

[5]Acuity also argues that the loss in question falls under the accounting error exclusion and that the funds do not constitute money, but the court need not reach those issues.

living quarters or the living quarters of a partner, within the living quarters of an employee having use and custody of the "property," at the premises of Delaget's offices, or in transit between any of those places. Based upon the language of the provision, the court finds that Carlon's money, contained in, and stolen from, Carlon's bank account, is not money "used in [Delaget's] business."

Some additional language from the Property Coverage Form is useful to the court's analysis. First, the form defines "Covered Property," then provides that Covered Property does not include money or securities, except as provided in the Money and Securities extension. (Grimley Aff. Ex. 1, Deluxe Bis-Pak Property Coverage Form [hereinafter Property Coverage Form], at 1) (Docket #59-1). Under the Property General Conditions, the form provides that "[n]o person or organization, other than [Delaget], having custody of Covered Property, will benefit from this insurance." (Property Coverage Form, at 20). Most other defined types of property within the form differentiate between personal property and property of others. (*See* Property Coverage Form, at 1) ("Business Personal Property" is defined as both "[p]roperty you own" used in your business as well as "[p]roperty of others that is in your care, custody or control"). However, as noted, the Money and Securities extension refers only to money "used in [Delaget's] business." It does not differentiate between personally owned money and money that is in the custody of the insured.

While the term "used" is not itself ambiguous, the phrase "used in your business" is less clear. Ultimately, however, the everyday meaning does not include the transferring and manipulation of funds between a client's bank accounts. The term "use" itself is

defined as "to put into action or service," or "to carry out a purpose or action by means of." Merriam-Webster Online, Used – Definition: http://www.merriam-webster.com/dictionary/used (last visited 4/25/12). *See also* Oxford English Dictionary, use, v., http://www.oed.com/view/Entry/220636?rskey=F2K8jS&result=2#eid (last visited April 25, 2012) ("To put to practical or effective use, esp. as a material or resource; to utilize."). Thus, "used in your business" is commonly understood to mean putting an object to use in accomplishing a business-related activity. It is also important to note that it is *money* that is being put to use, and the common meaning of using money is in conducting transactions; for example, spending money to purchase goods or services, or receiving money for the sale of such.

With those understandings in mind, it becomes clear that the money contained in Carlon's bank accounts was not used to accomplish Delaget's business goals in the commonly understood way. Carlon's money was the *object* of Delaget's business, in that Delaget provided accounting and cash management services, but Carlon's money was not *itself* used to accomplish Delaget's accounting and management services. Delaget never spent or received Carlon's money; it merely transferred this money between accounts. It did not use Carlon's money to pay Delaget employees in order to provide services to Carlon; it did not use Carlon's money to purchase accounting software for use in providing services to Carlon; it no more used Carlon's money to accomplish its business goals than a painter uses a house that she is contracted to paint. Thus, under the common meaning of the phrase, Carlon's money was not "used in [Delaget's] business."

Further, even if the phrase were ambiguous, construing it as Delaget urges would lead to an absurd result that could not have been contemplated by the insurer. Under Delaget's reading, the funds contained in any client's bank account (managed or otherwise accessed by Delaget) would be insured by Acuity, regardless of the fact that the third-party client and Acuity are not in a contractual relationship. Moreover, those client funds would be insured against loss *regardless of Delaget's involvement* in the loss. For example, had Carlon's funds been lost by some alleged action or negligence on the part of Carlon itself, that would still constitute a loss to money "used in [Delaget's] business." But finding coverage would fly in the face of the No Benefit to Bailee provision and the definition of Covered Property.[6] If Carlon's funds are money "used in [Delaget's] business," then Carlon's funds would be defined as Covered Property, and the No Benefit to Bailee provision prevents a third-party "having custody" of Covered Property from benefitting from the policy. Yet, to prevent Carlon's benefit in that situation would make little sense if Carlon's funds are covered by Delaget's insurance policy and Delaget is permitted to invoke coverage where there is a loss to its Covered Property. As Acuity points out, in the larger picture, Delaget's reading of "used in your business" would essentially turn Acuity's contract to insure Delaget into a contract to cover losses to all funds of any client Delaget has or chooses to take on. That result would indeed be absurd. That absurdity is further illustrated by the fact that the only real "loss" to Delaget here is if it is found liable to Carlon for *Carlon's* missing funds. As such, because Carlon's funds

[6]In fact, it would contradict this provision even if there were a principled way to narrow Delaget's reading to only those situations where Delaget is allegedly responsible for the loss.

were not money used in Delaget's business, there is no coverage under the Property Coverage Form.

Accordingly,

IT IS ORDERED that the defendant and third-party plaintiff's Motion to Strike (Docket #73) be and the same is hereby DENIED; and

IT IS FURTHER ORDERED that the intervenor defendant's Motion for Summary Judgment (Docket #53) be and the same is hereby GRANTED. Intervenor defendant Acuity, A Mutual Insurance Company, has no duty to defend or indemnify defendant and third-party plaintiff Delaget, LLC.

Dated at Milwaukee, Wisconsin, this 21st day of May, 2012.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge